1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                       FOR THE DISTRICT OF OREGON

9

10   BARBARA J. THUMMA,              )
                                     )    No. 04-6148-HU
11               Plaintiff,          )
                                     )
12        v.                         )
                                     )    FINDINGS AND RECOMMENDATION
13   JOANNE BARNHART, Commissioner   )
     of Social Security,            )
14                                   )
                 Defendant.          )
15   _____)

16

17   Aukjen T. Ingraham
     Ransom, Gilbertson, Martin & Ratliff
     317 S.W. Alder
18   Portland, Oregon 97204
          Attorney for plaintiff
19

20   Karin Immergut
     United States Attorney
     District of Oregon
21   Craig J. Casey
     Assistant United States Attorney
22   888 S.W. Fifth Avenue, Suite 1000
     Portland, Oregon 97204-2024
23

24   Franco L. Becia
     Special Assistant United States Attorney
25   701 Fifth Avenue, Suite 2900 MS/901
     Seattle, Washington 98104
          Attorneys for defendant
26

27

28   FINDINGS AND RECOMMENDATION Page 1

HUBEL, Magistrate Judge:

Barbara Thumma brought this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability benefits and Supplemental Security Income (SSI) benefits.

## Procedural Background

Ms. Thumma filed applications for disability and SSI benefits on August 17, 2000. Her date last insured for purposes of disability benefits was December 31, 2000. The applications were denied initially and on reconsideration. A hearing was held before Administrative Law Judge (ALJ) Gary W. Elliott. On December 27, 2002, the ALJ issued a decision finding Ms. Thumma not disabled. On March 15, 2004, the Appeals Council declined Ms. Thumma's request for review, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born March 27, 1946, Ms. Thumma was 56 years old at the time of the ALJ's decision. She completed high school and has one year of college and some vocational training. She alleges disability since September 15, 1995, based on a combination of impairments, including fibromyalgia, osteoarthritis, and depression. Her past relevant work is as a bank teller and courtesy clerk.

## Medical Evidence

Beginning in July 1993, Ms. Thumma saw Christopher J. Telge,

FINDINGS AND RECOMMENDATION Page 2

M.D., for her primary care. Tr. 234. The medical records indicate that she was treated for minor complaints, such as sinusitis, bronchitis, and tendinitis, until June 1994, when she complained of severe neck pain while in the process of recovering from a sore throat and bronchitis. Tr. 232. Upon examination, she demonstrated significant spasm and loss of motion in the cervical spine, although neurological examination was negative. Id. Dr. Telge diagnosed wryneck,[1] upper respiratory infection, and viral infection. Id.

On December 21, 1994, Ms. Thumma returned with complaints of left sided neck pain and stiffness, right sided low back pain, and headaches. Tr. 230. It was noted that she had been treated several months earlier for acute wryneck. Id. Upon examination, her neck area demonstrated some tenderness and nodularity along the paraspinous muscles of the neck and upper back, but neurological examination was normal. Id. She had good reflexes, strength, sensation, and proprioception in the hands and upper extremities. Id. Dr. Telge recommended mobilization therapy. Id. With respect to

_____

[1] Wryneck is defined as a "[c]ontracted state of one or more muscles of the neck, producing an abnormal position of the head. Occasionally it is acute, due to cold or trauma; more commonly it is chronic, spastic in character, and dependent upon nerve irritation. ... When acute, it generally passes away under influence of rest, heat and time." C.L. Thomas, ed., Taber's Cyclopedic Medical Dictionary (14th ed. 1981) 1580 (Taber's).

FINDINGS AND RECOMMENDATION Page 3

the low back pain, examination demonstrated some point tenderness in the right lumbosacral area and also tenderness along the course of the sciatic nerve. Id. Nerve testing and gross structural and neurological testing were otherwise unremarkable. Id. Dr. Telge diagnosed somatic dysfunction with strain and myositis, and mild sciatic neuritis in the lumbar spine. Id.

On December 28, 1994, Ms. Thumma was seen for a recheck of her neck pain complaints. Tr. 229. She reported that the pain was better since mobilization treatment to her neck and upper back. Id. Further manipulation was done to her cervical spine with good results; range of motion was noted to be improved. Id. She was given some mobilization rotational therapy to her low back, with instructions for stretching exercises. Id.

On January 5, 1995, Ms. Thumma reported that her neck and low back were doing better. Id. She demonstrated "rather good" range of motion. Id. Dr. Telge wrote, "Somatic dysfunction resolving." Id. It is unclear whether Dr. Telge intended this to imply any non-physical source of plaintiff's problems. Subsequent visits to Dr. Telge were for upper respiratory infections and gynecological examinations. Tr. 228. On May 8, 1995, Ms. Thumma complained that she woke up with severe pain in her right shoulder. Tr. 227. Dr. Telge diagnosed bursitis and prescribed analgesics, exercise, and a shoulder sling. Id.

On May 31, 1995, Ms. Thumma saw Dr. Telge for mood disorders and possible depression. Tr. 226. She was referred for further evaluation and treatment. Id. On August 22, 1995, she reported that

FINDINGS AND RECOMMENDATION Page 4

she continued to require Lodine for low back and neck pain, but that she was obtaining significant relief. Id. Physical examination was unremarkable. Id.

On October 13, 1995, Ms. Thumma complained of pain in her right front ribs for the past two weeks. Tr. 225. She had pain on palpation, but no bruising. Id. She was given Darvocet. Id.

In February 1997, Ms. Thumma began treatment with Bruce Duffy, M.D. Tr. 153. Her chief complaint was joint and muscle pain. Id. Examination showed multiple areas of muscle and joint aching with no swelling or clinical abnormalities except tenderness. Id. Dr. Duffy diagnosed fibromyalgia. Id. However, there is nothing in the record of this visit that establishes the clinical basis for a diagnosis of fibromyalgia. He took her off Lodine and prescribed Elavil. Id.

Ms. Thumma saw Dr. Duffy again on March 25, 1997. Tr. 152. She reported that she was much better on the Elavil, but that she had lumbar back pain and morning fatigue that was not improved with the Elavil. Id. Sacral area muscles were tender to palpation, but other findings were normal. Id.

On June 17, 1998, Ms. Thumma reported feeling rested and walking 30 minutes a day unless it was stormy. Tr. 151. However, she said she had achy legs. Id. Dr. Duffy wrote that she was moving "a bit stiffly" when getting out of a chair and walking. Id. There was some mild spasm and tenderness in the trapezoids. Id. Dr. Duffy discussed diet, exercise, and supplements. Id.

On June 29, 1998, Ms. Thumma was seen for ongoing tinnitis.

_Id._ She had a mild bilateral temporal mandibular joint (TMJ) click. _Id._ She was given an audiology referral to Allan S. Mehr, an audiologist. _Id._; Tr. 140.

On July 30, 1998, Ms. Thumma was seen for a complaint of mild hearing loss. Tr. 150. It was noted that her audiogram showed a mild conductive hearing loss, but discrimination was excellent. _Id._ She had no other otologic symptom complaints except for occasional tinnitus, which was not currently present. _Id._

On July 30, 1998, she was seen by Gary Nishioka, M.D. for a sore throat. Tr. 149. On November 11, 1999, she was treated for the flu with Robitussin and Relenza. It was noted that a sinus CT was positive for pan-sinus disease, and she was put on Amoxicillin for 14 days. _Id._ On November 24, 1999, she was seen for coughing and chest tightness; on November 30, 1999, she complained of congestion, coughing, and sinus pain on the left. _Id._ On December 3, 1999, Ms. Thumma reported that she was still having symptoms and complained that her throat was a "little sore." _Id._ She was told to use a humidifier, drink hot liquids, and take Robitussin. _Id._

In December 1999 and January 2000, Ms. Thumma was treated for persistent sinusitis. Tr. 147. On January 20, 2000, Dr. Nishioka wrote that he thought the sinusitis was the result of her apparent viral illness in November 1999, and that it had been treated with amoxicillin, Septra, Nasonex, and nasal saline spray, with some initial improvement, but then relapsed. Tr. 146. Dr. Nishioka noted Ms. Thumma's history of smoking one to two packs of cigarettes per day. _Id._ Dr. Nishioka ordered a paranasal CT scan. _Id._

On January 21, 2000, it was noted that the paranasal sinus CT scan showed interval improvement since November 1999. Tr. 144. However, she still had persistent symptoms. Id. Dr. Nishioka recommended that she continue with the nasal saline hydration therapy and emphasized again that tobacco would be the limiting factor in achieving resolution of her symptoms. Id. He prescribed Cipro. Id.

On February 4, 2000, Ms. Thumma began treating with Michael Rohwer, M.D. Tr. 182. Dr. Rohwer wrote that Ms. Thumma "has what she believes is fibromyalgia with a variety of symptoms related to that." Id. Among the symptoms reported were multiple aches and complaints, TMJ pain, poor sleep cycle, some depression, and sound sensitivity. Tr. 183. Dr. Rohwer referred Ms. Thumma to a rheumatologist for a consultation. Id.

On February 25, 2000, James K. Smith, M.D., a rheumatologist, wrote a letter to Dr. Rohwer. Tr. 164. Dr. Smith noted that Ms. Thumma's chief complaint was diffuse pain for the past five years. Id. She reported seeing primary care physicians in the past, but mainly trying herbal remedies such as St. John's wort and stretching exercises. Id. Ms. Thumma reported that she "occasionally has impairment due to pain." Id. Medical therapies had included Lodine from 1994 to 1996, which was discontinued because of dyspepsia, ibuprofen intermittently, Elavil which was discontinued because it caused excessive sedation, and acupuncture. Id.

Upon examination, fibromyalgia tender points were positive at

the trapezii, scapulae, sternum, forearm, buttocks, greater trochanter, and medial knee fat pads. Tr. 165. Treating the use of the plural for some tender points as meaning they were positive bilaterally, this amounts to 11 of the standard 18 tender points used in diagnosing fibromyalgia. Dr. Smith thought Ms. Thumma "most likely does have fibromyalgia syndrome," as there was no evidence of inflammatory arthritic disease. Id. Dr. Smith recommended physical therapy and prescribed Guaifenesin and Ultram. Id.

On March 10, 2000, Dr. Rohwer wrote that Ms. Thumma's fibromyalgia had been "confirmed by rheumatologist in Portland," who had made several recommendations. Tr. 181. Ms. Thumma and Dr. Rohwer had a 15-minute discussion about a book she had received at the hospital; Dr. Rohwer thought the book "promotes many nonscientific treatments and rationales." Id. Dr. Rohwer wrote,

> I have no doubt that she has myalgias and may well have fibromyalgia. Treatment will be somewhat difficult in view of the apparent recommendation for several nonscientific tests and treatments with which I will not comply. ... Nonetheless, I will provide a trial of physical therapy ... and Guaifenesin as recommended by her rheumatologist. ... {T]here is no evidence of inflammatory disorder which by exclusion and based on her symptoms, leaves [sic] to the diagnosis of the fibromyalgia syndrome.

Id.

Ms. Thumma began physical therapy on March 14, 2000. Tr. 191-194. She was scheduled to attend twice a week for six weeks. Tr. 194. Her diagnosis was noted to be "fibromyalgia with recent flare-up affecting the neck when she developed the flu this winter." Id. On the basis of a questionnaire, the physical therapist estimated that Ms. Thumma's neck disability index was 44%, moderate. Id. The

FINDINGS AND RECOMMENDATION Page 8

treatment plan included home exercise, mechanical traction, electrical stimulation, therapeutic exercise, ultrasound, posture/body mechanics training, and hot packs. Id. However, Ms. Thumma completed only six of the twelve scheduled treatments, then phoned on April 6, 2000 to say she would not be returning. Tr. 192. She said she was discouraged with her lack of progress and was going to see a chiropractor. Id. The physical therapist noted that she had tolerated treatment well and "felt better following visit but that did not last." Id.

On April 26, 2000, Ms. Thumma saw Dr. Rohwer for a routine physical examination. Tr. 172. She reported "doing well." Id. Ms. Thumma reported that physical therapy had not helped her. Id. She continued to have diffuse myalgias and arthralgias that were "migratory." Id.

According to a Residual Physical Functional Capacity Assessment completed on November 22, 2000 by Social Security reviewing physicians Linda Jensen, M.D., a physical medicine and rehabilitation specialist, and Charles Spray, M.D., an internist, Ms. Thumma's primary diagnosis was fibromyalgia, with a secondary diagnosis of osteoporosis. Tr. 213-218. In their opinion, Ms. Thumma was capable of lifting 20 pounds occasionally and 10 pounds frequently; standing and/or walking about six hours out of an eight hour workday; and sitting about six hours in an eight hour workday. Doctors Jensen and Spray opined that Ms. Thumma's allegations of symptoms were consistent with these diagnoses, and that Ms. Thumma's reported symptoms and functional limitations were

consistent with the medical findings. Tr. 217.

On August 3, 2001, Ms. Thumma saw Mark Scherlie, D.O., for an initial evaluation. Tr. 253. Dr. Scherlie wrote, "Apparently has known history of fibromyalgia." Id. She was currently taking Lodine and trying Mobic (meloxicam) and Flexeril. Id. Upon examination, her upper extremity range of motion was within normal limits, but there was increased thoracic kyphosis[2] and tenderness across the trapezius and mid-back. Id. Dr. Scherlie's diagnosis was fibromyalgia with associated features of sleep disorder and chronic pain. Id. She was started on amitriptyline. Id.

On January 23, 2002, Dr. Scherlie noted that Ms. Thumma reported the amitriptyline was too sedating. Id. Examination revealed increased spasm and tenderness throughout the trapezius and medial scapular border, as well as the cervical spine. Id. Dr. Scherlie tried her on Guiafenesin. Id.

On May 20, 2002, Ms. Thumma saw Dr. Scherlie complaining of right shoulder pain and discomfort for the past several weeks. Tr. 254. Ms. Thumma said she had been using Mobic regularly, with some improvement in her symptoms. Id. On examination, her right shoulder was within normal limits for range of motion; left shoulder range of motion was somewhat limited. Palpation revealed tenderness in the subacromial bursa posteriorly and anteriorly over the bicipital tendon. Id. Dr. Scherlie diagnosed left shoulder bursitis and left bicipital tendinitis. Id. She was given Celebrex and provided with

---

[2] Exaggeration of the normal posterior curve of the spine. Taber's at 781.

FINDINGS AND RECOMMENDATION Page 10

range of motion exercises. Id.

According to a Residual Functional Capacity Assessment completed by Dr. Scherlie on November 30, 2002, Ms. Thumma's symptoms were attributable to fibromyalgia; their severity and duration were consistent with fibromyalgia; and the severity of her illness and its effect on her functioning was consistent with fibromyalgia. Tr. 262. However, he did not fill in the parts of the form dealing with exertional limitations. Tr. 257-261.

### Hearing Testimony

Ms. Thumma testified at the hearing that she was unable to work because she was "in constant pain and cannot think properly," and because she gets "terribly tired." Tr. 274. She testified that the pain was worse on the left side than on the right, but was "head to toe," specifically in her shoulder area, neck and left hip, and down her leg. Id. She said she uses a heating pad and a thermal pain patch, tr. 277, and that the pain is made worse by heat or cold,[3] loud noises, uncomfortable environments, repetitive motion, and too much stress. Tr. 278-79. She explained that by "stress," she meant "anything that involves hurrying," or time pressured tasks. Tr. 278. Ms. Thumma estimated that she could sit half an hour to an hour without having to change positions, and that she could stand about 10 minutes at a time. Tr. 279, 280. She is able to do the dishes in stages, walk approximately two blocks at a time, tr. 280, and lift five to 10 pounds. Tr. 281. However,

---

[3] Ms. Thumma did not explain why, if her pain is worsened by heat, she uses a heating pad.

FINDINGS AND RECOMMENDATION Page 11

she said that any constant movement would cause her pain to flare. Tr. 281. She said she sleeps about two hours during the day, tr. 282. Her husband does most of the housework. Tr. 283. Two or three times a year, she gets headaches that make her nauseated and photophobic; she also gets less severe headaches two or three times a week. Tr. 284-85. Ms. Thumma said the pain causes her to be depressed, but that after several trials with antidepressants, she has not found one that works for her. Tr. 286-87.

Ms. Thumma testified that although she had enjoyed gardening in the past, she had not been unsuccessful at it that summer, being unable to pull weeds or take care of her flower beds. Tr. 291. She is no longer able to do crafts as before. Tr. 292.

Ms. Thumma's husband testified that his wife's energy level is very low, and that she is in pain "almost daily." Tr. 295, 296. He stated that her movements were labored, and that at times she would "break into tears at a very light touch to the body." Tr. 296. She is no longer able to vacuum, and must lean on the counter and take breaks when she washes dishes. Id.

Ms. Thumma's daughter, Michelle Medler, also testified. Tr. 297. She sees her mother about once a month and talks to her once or twice a week. Tr. 297-98. She testified that her mother had "changed a lot in the last number of years," and was no longer able to do her crafts and hobbies or take care of the house as before. Tr. 298. Ms. Medler testified that her mother walks slowly and with difficulty, struggles to get up, and looks as though she is in pain. Tr. 298. Ms. Medler, a musician, said that her mother used to

attend her concerts "all the time," but that she currently "comes very rarely." Tr. 299.

The ALJ called vocational expert (VE) Kay Hartgrave. The VE testified that Ms. Thumma's previous work as a grocery courtesy clerk was at the light exertional level and semiskilled, and that her work as a bank teller was at the light exertional level and skilled. Tr. 302. The ALJ asked the VE to consider a hypothetical individual of Ms. Thumma's age, education, and vocational background, able to lift 20 pounds occasionally, 10 pounds frequently, stand and/or walk six hours out of an eight-hour day, sit six hours out of an eight-hour day, with frequent overhead reaching and occasional climbing, balancing, stooping, kneeling, crouching and crawling. Tr. 303. The VE testified that in her opinion, such an individual would be able to do Ms. Thumma's past relevant work. Id. The ALJ then amended the hypothetical to include a person who could do no overhead reaching, climbing, balancing, or stooping, and only occasional kneeling, and also limited to short tasks and instructions. Tr. 303. The VE opined that with these limitations, Ms. Thumma would not be able to do her past relevant work because the second hypothetical represented a person able to do no more than sedentary, unskilled work. Id.

**ALJ's Decision**

The ALJ found that Ms. Thumma's impairments-- osteoarthritis and "disorder of the muscles, ligament and fascia" limited her to light exertion, except that she was additionally precluded from frequent overhead work, and could only occasionally stoop, crouch,

and kneel. He found that she retained the residual functional capacity to return to her previous work as a courtesy clerk and bank teller.

The ALJ noted that Dr. Duffy had diagnosed fibromyalgia, but the ALJ found that at the time of that diagnosis, Ms. Thumma indicated that she was sleeping 6-7 hours and felt well, had up to six cups of coffee a day, was smoking one to two packs of cigarettes a day, and walked her dogs for exercise. Further, she listed recreational activities such as reading, jewelry, doll collecting, fishing and gardening.

The ALJ found that Dr. Rowher's diagnosis of fibromyalgia was "presumptive only." Tr. 21. The ALJ noted that during Dr. Rohwer's examination on February 4, 2000, Ms. Thumma's laboratory data showed no evidence of inflammatory disorder, "which by exclusion and based on her symptoms, leaves [sic] to the diagnosis of fibromyalgia syndrome." Id. On the basis of this statement by Dr. Rohwer, the ALJ found that it was "clear that the diagnosis of fibromyalgia was arrived at on the basis of her history of pain complaints, rather than as a result of a thorough diagnostic workup." Id. The ALJ found "no indication" that the established diagnostic criteria for fibromyalgia had been met in any of Ms. Thumma's examinations, specifically because there was no evidence of consistent tenderness in at least 11 of the 18 specified tender points. Id.

The ALJ found that Ms. Thumma appeared to be "shopping around" for a physician who would prescribe what she wanted and "would not

FINDINGS AND RECOMMENDATION Page 14

require an effort on her part." Id. The ALJ noted that despite urging by her doctors, Ms. Thumma continued to smoke, and that she completed only six of 12 scheduled physical therapy visits.

The ALJ found Ms. Thumma's testimony not credible "as the medical record does not support her alleged level of pain." Tr. 22. Further, the ALJ found that her activity level, including working in the yard, indicated that she did not have pain throughout her body as she alleged, or at least not at a level that precluded activities. Tr. 22. The ALJ cited to a third party report stating that Ms. Thumma gardened a couple of times a month, doing light weeding or planting small flowers; worked at arts and crafts, restoring dolls, for several hours three or four times a week; used the Internet daily for an hour at a time; called friends and relatives weekly and called her daughter almost daily.

## Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick

FINDINGS AND RECOMMENDATION Page 15

v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at

140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. <u>Yuckert</u>, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, she is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, she is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform her past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work

FINDINGS AND RECOMMENDATION Page 17

experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

### Discussion

Ms. Thumma asserts that the ALJ erred when he improperly rejected the opinions of her treating and examining physicians, including Dr. Smith and Dr. Duffy, that she had fibromyalgia, and when he rejected her own testimony. She urges the court to credit the doctors' opinions and her own testimony as true, and reverse the Commissioner's decision for an award of benefits.

In <u>Varney v. Secretary of Health and Human Services (Varney II)</u>, 859 F.2d 1396, 1398-99 (9th Cir. 1988) the court held that a claimant's pain testimony must be accepted as true when it is inadequately rejected by the ALJ. The rule was extended in <u>Hammock v. Bowen</u>, 867 F.2d 1209, 1213 (9th Cir. 1989) to encompass crediting medical opinions as true. However, since <u>Varney</u>, some panels have chosen to remand for further proceedings rather than apply the "crediting as true" rule. See, e.g., <u>McAllister v. Sullivan</u>, 888 F.2d 599, 603 (9th Cir. 1989)(remanding to require the requisite specific and legitimate reasons for disregarding the treating physician's opinion); <u>Dodrill v. Shalala</u>, 12 F.3d 915, 919 (9th Cir. 1993)(remanding where ALJ improperly rejected claimant's testimony and testimony of lay witnesses, without crediting any of the testimony as true). In general, when the evidence is strongly in the claimant's favor and the equities are against further delay, the court should apply the "crediting as true" rule. See, e.g., <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996), where court

FINDINGS AND RECOMMENDATION Page 18

credited as true a treating physician's opinion, because an abundance of evidence supported that interpretation and the claimant had waited 12 years for resolution of the claim.

In Varney, 859 F.2d at 1398, and in Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000) the court explained that requiring the ALJ to articulate the specific factors involved in rejecting the physician's opinion or the claimant's testimony "helps to improve the performance of the ALJs by discouraging them from reach[ing] a conclusion first, and then attempt[ing] to justify it by ignoring competent evidence."

1.    Rejection of physicians' opinions

The medical record shows that Ms. Thumma was diagnosed with fibromyalgia by Dr. Duffy in February 1997,[4] by Dr. Smith in February 2000, and by Dr. Scherlie in 2001.[5] Agency reviewing physicians Jensen and Spray concurred in this diagnosis in their November 2000 report. Nevertheless, the ALJ found that Ms. Thumma's

---

[4] Although it should be noted that Dr. Duffy's treatment records do not demonstrate that Ms. Thumma met the diagnostic criteria for fibromyalgia. He documented no finding that he found the requisite 11 tender points on palpation.

[5] Dr. Scherli's treatment notes similarly fail to indicate that Ms. Thumma met the diagnostic criteria for fibromyalgia. He noted tenderness in only two areas and specifically stated that she was in "no acute distress." Nonetheless, he did make the diagnosis.

impairments were osteoarthritis and "disorder of the muscles, ligament and fascia." The ALJ has not provided a citation to the evidentiary record to support this latter impairment, and I have been unable to find such a diagnosis in the medical records.

Although the ALJ rejected Dr. Rohwer's diagnosis of fibromyalgia on the ground that it was merely "presumptive," the ALJ gave no reasons for rejecting the same diagnosis by treating Doctors Duffy, Smith, and Scherlie, and by reviewing doctors Jensen and Spray. Although Dr. Rohwer's notes, see tr. 181-83, suggest a less than convinced acceptance of the fibromyalgia diagnosis, he nonetheless did accept Dr. Smith's diagnosis and did embark on a fibromyalgia treatment regimen that reflected what he believed to be scientifically supportable.

Social Security regulations require the Commissioner to consider all of the medical opinions submitted by the claimant. 20 C.F.R. § 404.1527 (b), (c), (d). If a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R. § 404.1527(d)(2). I note here that Doctors Duffy and Scherli's opinions are not supported by their own medically accepted diagnostic techniques, nor does it appear they had Dr. Smith's records. Dr. Rohwer was skeptical of the diagnosis but relied on Dr. Smith's diagnosis. Thus, the only treating doctor who has made a clinically supportable diagnosis of fibromyalgia is Dr.

Smith.

An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. Id. at 1202.

It appears, from the ALJ's references to the lack of a "thorough diagnostic workup," and "essentially normal laboratory results," that the ALJ may have ignored the diagnosis of fibromyalgia because it was not confirmed by laboratory findings. If so, he was in error. Fibromyalgia is diagnosed "entirely on the basis of patients' reports of pain and other symptoms," and there "are no laboratory tests to confirm the diagnosis." Benecke v. Barnhart, 379 F.3d 587, (9th Cir. 2004); see also Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001)(symptoms of fibromyalgia are entirely subjective; there are no laboratory tests for the presence or severity of fibromyalgia).

According to the American College of Rheumatology, the criteria for diagnosing fibromyalgia are a history of widespread pain, and pain in 11 "tender point sites on digital palpation." www.rheumatology.org/publications/classification/fibromyalgia/ fibro.asp (1990 criteria for the classification of fibromyalgia). Both criteria must be met. Id.

Widespread pain is further defined as "pain in the left side of the body, pain in the right side of the body, pain above the waist, and pain below the waist." Id. In addition, "axial skeletal pain (cervical spine or anterior chest or thoracic spine or low back) must be present. Id. shoulder and buttock pain is considered

FINDINGS AND RECOMMENDATION Page 21

as pain for each involved site and low back pain is considered lower segment pain. _Id._ Widespread pain must have been present for at least three months. _Id._

As to the "tender point sites," the criteria note the specific bilateral sites at which to test for pain. _Id._ Digital palpation should be performed with an approximate force of four kilograms. _Id._ Notably, "[f]or a tender point to be considered 'positive[,]' the subject must state that the palpation was painful. 'Tender' is not to be considered 'painful.'" _Id._

In February 2000, Dr. Smith noted that he found positive tender points at the trapezii (plural), scapulae (plural), sternum, forearm, buttocks (plural), greater trochanter, and medial knee fat pads (plural)-- the requisite 11 tender points needed for diagnosis. Tr. 165. The ALJ's finding that the record did not reveal any indication that the established diagnostic criteria for fibromyalgia had been met was erroneous.

The ALJ's finding that Ms. Thumma's impairment was "disorder of the muscles, ligament and fascia," rather than fibromyalgia is without evidentiary support in the record. His rejection, without explanation, of the opinion of Doctor Smith that Ms. Thumma has fibromyalgia was both legally erroneous and unsupported by substantial evidence in the record. Dr. Smith's diagnosis is straightforward and supported by the requisite diagnostic findings. I therefore recommend that the opinions of Doctor Smith on the diagnosis of fibromyalgia be credited as true. The opinions of Doctors Duffy, Rohwer, Scherli, Jensen and Spray are not

inconsistent with Dr. Smith's diagnosis.

2.    Rejection of Ms. Thumma's testimony

Ms. Thumma asserts that the ALJ failed to provide clear and convincing reasons for his rejection of her testimony about her pain and symptomology.

Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be "clear and convincing." <u>Reddick</u>, 157 at 722. The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. <u>Id.</u> The evidence upon which the ALJ relies must be substantial. <u>Id.</u> at 724. See also <u>Holohan</u>, 246 F.3d at 1208(same). General findings, such as references to the "record in general" are an insufficient basis to support an adverse credibility determination. <u>Reddick</u> at 722; see also <u>Holohan</u>, 246 F.3d at 1208.

There is no evidence of malingering in the evidentiary record of this case.[6] Accordingly, the ALJ's stated reasons for rejecting Ms. Thumma's testimony must be "clear and convincing," must identify what testimony is not credible, and must identify substantial evidence that undermines her testimony. Factors that the adjudicator may consider when determining credibility of pain complaints include claimant's daily activities, inconsistencies in testimony, and the unexplained absence of treatment for excessive

---

[6] Dr. Telge's reference in January 1995 to "somatic dysfunction" is too ambiguous to suggest affirmative evidence of malingering.

1    pain. <u>Orteza v. Shalala</u>, 50 F.3d 748 (9th Cir. 1995).

2        The ALJ rejected Ms. Thumma's testimony about pain because he
3    found it inconsistent with 1) her failure to complete her course of
4    physical therapy; 2) the physical therapist's record at the initial
5    visit on March 14, 2000, that Ms. Thumma was able to care for
6    herself, "lift heavy weights," drive her car and engage in usual
7    recreation activities; 3) Ms. Thumma's statement on May 20, 2002,
8    that working in the yard gave her mild improvement in her symptoms;
9    and 4) activities reported by her husband in a third-party report
10   dated October 16, 2000. Tr. 83-94. According to the ALJ, these
11   activities included gardening, working at arts and crafts, using
12   the Internet for an hour a day, telephoning friends, relatives, and
13   her daughter, driving herself to the grocery store, and doing
14   laundry and dishes.

15       Ms. Thumma's failure to complete the physical therapy regimen
16   is a legitimate reason for disbelieving her symptom testimony. See
17   <u>Orteza</u>, 50 F.3d at 750.

18       Ms. Thumma did not report to the physical therapist that she
19   was able to "lift heavy weights," or that she was able to engage in
20   recreational activities. The actual statements she endorsed on that
21   visit were:

22       1.   I can look after myself normally but it causes me extra
23            pain.

24       2.   I can lift heavy weights but it gives me extra pain.

25       3.   I can read as much as I want with moderate pain in my
26            neck.

27

28   FINDINGS AND RECOMMENDATION Page 24

4.   I cannot do my usual work.

5.   I can drive my car as long as I want with moderate pain in my neck.

6.   My sleep is greatly disturbed.

7.   I am able to engage in a few of my usual recreation activities because of pain in my neck. [Sic]

Tr. 193. These statements, when considered in full and in context, cannot fairly be read to indicate that Ms. Thumma is able to lift heavy weights or engage in "usual" recreational activities.

I find no error in the ALJ's credibility finding based on Ms. Thumma's statement to Dr. Scherlie in May 2002 that she had experienced improvement in her symptoms with yard work. That statement is inconsistent with her hearing testimony. She testified at the hearing in December 2002 that she "did not succeed" with gardening "this summer," even though she had "tr[ied] to get out and do some things," because it "gets harder every year." Tr. 291.

The ALJ's adverse credibility finding based on the inconsistencies between Ms. Thumma's hearing testimony and the statements made by Mr. Thumma is problematic. With respect to Ms. Thumma's claim for SSI benefits, it does not constitute a clear and convincing reason for rejecting Ms. Thumma's testimony because Mr. Thumma's report is dated October 2000, more than two years before the December 2002 hearing, and both Mr. Thumma and Ms. Medler testified that Ms. Thumma's condition had deteriorated during the past few years. When the disability claimant's condition is reported to be deteriorating, such remote evidence is not

FINDINGS AND RECOMMENDATION Page 25

probative. See <u>Young v. Heckler</u>, 803 F.2d 963 (9th Cir. 1986)(where physical condition is deteriorating, most recent medical report is most probative).

Further, when Mr. Thumma's statements are read in full and in context, he actually reported that his wife went to the grocery store once a week, tr. 84, driving approximately two miles, tr. 86. Mr. Thumma added that Ms. Thumma did not participate in social activities and never visited friends. Tr. 84. Mr. Thumma did report that Ms. Thumma gardened once or twice a month, but qualified this by saying, "maybe half an hour of light weeding or planting small flowers." Tr. 88.

However, Ms. Thumma's date last insured for purposes of her claim for disability benefits is December 31, 2000. Mr. Thumma's report of his wife's activities dated October 2000 is pertinent to the question of whether Ms. Thumma was disabled on or before December 31, 2000–before the deterioration noted by Mr. Thumma and Ms. Medler thereafter. As discussed below, the issue of Ms. Thumma's disability on or before December 31, 2000 for purposes of her claim for disability benefits requires a separate analysis from her claim for SSI benefits.

The ALJ failed to make any findings supporting his rejection of other aspects of Ms. Thumma's testimony, including her reports of frequent headaches, occasional migraine headaches, fatigue, and depression. However, I do not recommend that Ms. Thumma's testimony be credited as true and the case remanded for an award of benefits.

The decision whether to remand for further proceedings turns

upon the likely utility of such proceedings. <u>Harman</u>, 211 F.3d at 1179. A remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits. <u>Holohan</u>, 246 F.3d at 1210. In cases in which it is evident from the record that benefits should be awarded, remanding for further proceedings would needlessly delay effectuating the primary purpose of the Social Security Act-- i.e., to give financial assistance to disabled persons because they cannot sustain themselves. <u>Id.</u>

In <u>Smolen</u>, 80 F.3d at 1292, the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. If the <u>Smolen</u> test is satisfied, then remand for payment of benefits is warranted regardless of whether the ALJ *might* have articulated adequate findings. <u>Harman</u> at 1173.

I am not persuaded that the <u>Smolen</u> test is satisfied in this case, because some outstanding issues remain before a determination of disability can be made, including 1) whether Ms. Thumma's fibromyalgia was disabling on or before December 31, 2000, for purposes of her claim for disability benefits; and 2) whether Ms. Thumma's fibromyalgia was disabling after December 31, 2000, which requires a determination of her residual functional capacity and

FINDINGS AND RECOMMENDATION Page 27

its application, if any, to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2 in view of her age. I recommend, therefore, that this case be remanded to the Commissioner for additional proceedings to resolve these issues.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due May 23, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due June 6, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 5th day of May, 2005.

/s/   Dennis J. Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 28